# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION AT MEMPHIS

| | | |
|---|---|---|
| BLACK FARMERS & | : | CASE NO. 2:23-CV-02527 |
| AGRICULTURALISTS | : | |
| ASSOCIATION, INC. | : | |
| 287 MADISON AVENUE | : | CHIEF JUDGE SHERYL LIPMAN |
| MEMPHIS, TN 38103 | : | |
| | : | MAGISTRATE JUDGE |
| AND | : | CHARMAINE G. CLAXTON |
| | : | |
| THOMAS BURRELL | : | |
| 436 HIGHWAY 70 WEST | : | CLASS ALLEGATIONS |
| MASON, TN 38049 | : | ENDORSED HEREON |
| | : | |
| AND | : | |
| | : | |
| MARY FERGUSON | : | |
| C/O 287 MADISON AVENUE | : | |
| MEMPHIS, TN 38103 | : | |
| | : | |
| AND | : | |
| | : | |
| CLAUDETTE JACKSON | : | |
| C/O 287 MADISON AVENUE | : | |
| MEMPHIS, TN 38103 | : | |
| | : | |
| AND | : | |
| | : | |
| MAUZIE J. FURLOW | : | |
| 141 WEST JACKSON AVE. APT. B1 | : | |
| WEST MEMPHIS, TN 72301 | : | |
| | : | |
| PLAINTIFFS, | : | |
| | : | |
| VS | : | |
| | : | |
| THE HONORABLE THOMAS J. | : | |
| VILSACK, ET AL. | : | |
| | : | |
| DEFENDANTS. | : | |

# FIRST AMENDED COMPLAINT FOR CLASS, DECLARATORY AND INJUNCTIVE RELIEF

## I.       INTRODUCTION

Plaintiffs, the Black Farmers and Agriculturalists Association, Inc. (hereinafter "BFAA"), Thomas Burrell, Mary Ferguson, Claudette Jackson, and  Mauzie J. Furlow, respectfully seek judicial review of final agency action by the United States Department of Agriculture in connection with implementation of Section 22007 of the Inflation Reduction Act (hereinafter "IRA") Pub. L. 117-169 136 Stat. 1818.  The IRA was signed into law by President Biden on August 16, 2022. The IRA provides $2.2 Billion dollars in financial assistance to farmers, ranchers and forest landowners who prior to January 1, 2021, experienced discrimination in a USDA farm lending program. Following enactment of the IRA, USDA undertook measures to implement Section 22007.  In that connection, USDA initially announced on July 7, 2023, that USDA had established a Discrimination Financial Assistance Program, (hereinafter "DFAP") Under DFAP persons discriminated against in a USDA loan program prior to January 1, 2021, were initially required to submit applications for financial assistance by October 31, 2023.  On September 23, 2023, USDA extended the October 31, 2023 deadline until January 13, 2024. The January 13, 2024 deadline is arbitrary and capricious, violative of separation of powers and Due Process for the reason BFAA members such as Plaintiffs Jackson and Ferguson, with legacy applications, those being submitted on behalf of deceased farmers whose heirs must obtain probate court or other judicial authority in order to apply, the complexity of the USDA application process and past experience indicate the deadline is both untenable and unlawful.  In addition to the establishment by USDA of an arbitrary and capricious application deadline, USDA has without authority and contrary to the express terms of Section 22007,  limited relief to discrimination in connection with  USDA Farm loans rather than all USDA lending programs as mandated by Section 22007, lending programs applicable to applicants  such as Plaintiff Furlow, an applicant for a USDA housing loan.

2

In past instances where USDA has provided financial assistance to farmers discriminated against by USDA, discrimination claimants were required to submit a mere three page application for relief financial assistance and the application window was open for significantly longer. See, Exhibit A, ECF Docket No. 1-1, Page ID #18, for a copy of the DFAP application. The application is 40 pages in length.  The application window has now been extended, but for  a mere 74 days. There is no authority in Section 22007 for this shortened application period. The shortened application window is unjustified as Congress stated in §22007 that funds are available for financial assistance until September 30, 2031. Plaintiffs are aggrieved by the shortened application window, the restriction of applications to USDA farm loans only and the exclusion of legacy claims.

## II.     HISTORY

1.     Over the past several years, USDA has resolved discrimination lawsuits with several different groups of farmers. These lawsuits, challenged discrimination in USDA's lending programs. The United States Circuit Court of Appeals stated in *The Estate of Earnest Lee Boyland, et al. v. United States Department of Agriculture,* Case No. 17-5082, a case involving BFAA members, "farmers' bottom lines fluctuate with the weather and crop prices, so "many farmers depend heavily on the credit and benefit programs of the United States Department of Agriculture to take them from one year to the next." *Pigford v. Glickman* (*Pigford I*), 185 F.R.D. 82, 86 (D.D.C. 1999) (footnote omitted). If a farmer's crops fail, "he may not have sufficient resources to buy seeds to plant in the following season"; if he needs a new grain harvester, "he often cannot afford to buy the harvester without an extension of credit." Id. "Because of the seasonal nature of farming, it also is of utmost importance that credit and benefit applications be processed quickly or the farmer may lose all or most of his anticipated income for an entire year." Id.

2.      The Boyland Court also stated, "public protests over discrimination in USDA's credit and benefit programs spurred the Department to investigate. That scrutiny uncovered a widespread pattern of discrimination in the Department's agricultural credit and benefit programs. In 1996, then-Secretary of Agriculture Dan Glickman appointed a Civil Rights Action Team to assess the Department's history of racial discrimination and recommend changes. See id. at 88. The Action Team documented extensive economic harm to minority farmers from discrimination in USDA programs. See id. at 86-88. That discrimination owed partly to USDA's practice of delegating loan application decisions to small, local committees in each county. Id. at 86. The county committees were far less diverse than the communities they served. Id. at 87. USDA denied or delayed processing loan applications, approved insufficient amounts, discriminatorily denied access to loan servicing options, or imposed restrictive conditions on loans because of the applicants' race, sex, or ethnicity. See Fourth Am. Compl. 3, *Love v. Veneman*, No. 1:00-cv-02502 (D.D.C. July 13, 2012), ECF No. 160 (female farmers); Eighth Am. Compl. 2, *Keepseagle v. Veneman*, No. 1:99-cv-03119 (D.D.C. Feb. 11, 2008), ECF No. 460 (Native American farmers); Third Am. Compl. 13, *Garcia v. Veneman*, No. 1:00cv-02445 (D.D.C. June 30, 2006), ECF No. 144 (Hispanic farmers); Pigford .1, 185 F.R.D. at 87 (black farmers).  claims formed the core of the four lawsuits filed against USDA on behalf of black, Native American, women, and Hispanic farmers.

3.      In 1998, Congress responded to the farmers' predicament by lifting the time bar for farmers who had made timely efforts to seek administrative redress for credit discrimination but were stymied by the dysfunction at USDA. See 7 U.S.C. § 2279 note (Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub. L. No. 105-277, § 741, 112 Stat. 2681) ("Appropriations Act"). The Appropriations Act tolled the statute of limitations for two years after

its passage from October 1998 to October 2000— for people who (1) alleged non-employment-related discrimination by USDA occurring between January 1, 1981, and December 31, 1996, and (20 had filed a complaint with USDA before July 1, 1997.

4.      To date, USDA has resolved the discrimination lawsuits of four groups of farmers. For each group, the only farmers permitted to participate in the claims-resolution processes established in response to these cases were those who had, before the suits were filed, complained in some manner of USDA's discrimination. Framework for Hispanic or Female Farmers' Claims Process ¶¶ VIII.A VII.B, VIII.C.1 g. *Love*, No. 1:00-cv-02502 (D.D.C. Jan. 20, 2012), ECF No. 155-1 ("*Garcia/ Love* Framework"); *Keepseagle*, No. 1:99-cv-03119, 2001 W1, 34676944, at *6 (D.D.C. Dec. 12, 2001); Pigford I, 185 F.R.D. at 92.

5.      USDA settled with the class of Black Farmers first, in 1999, in Pigford I. 185 F.R.D. 82. The court approved the creation of a two-track dispute resolution mechanism for distributing proceeds to claimants. Under that process, claimants with less documentary evidence of discrimination received capped payments, while claimants with more documentary evidence could seek to prove and recover actual damages. *Pigford I*, 185 F.R.D. at 95-97.

> In order to be eligible for relief, a claimant must submit his completed claim package to the facilitator postmarked within 180 days of the date of entry of this Consent Decree, except that a claimant whose claim is otherwise timely shall have not less than 30 days to submit a declaration pursuant to subparagraph (b)(iii), above, after being
>
> (g) A claimant who satisfies the definition of the class in ¶ 2(a), above, but who fails to submit a completed claim package within 180 days of entry of this Consent Decree may petition the Court to permit him to nonetheless participate in the claims resolution procedures. The Court shall grant such a petition only where the claimant demonstrates that his failure to submit a timely claim was due to extraordinary circumstances beyond his control.

*Pigford v. Glickman*, 185 F.R.D. 82 (D.D.C. 1999) (Emphasis added.

6.      The process established in *Pigford I* became a template for the other cases. Next, USDA settled a class action suit with Native American farmers. See *Keepseagle*, No. 1:99-cv-03119, 2012 WL 13098692, at *1 (D.D.C. Dec. 28, 2012). Similar lawsuits by Hispanic and female farmers followed, but did not result in class-wide settlements because neither case was certified as a class action. *Garcia v. Johanns*, 444 F.3d 625 (D.C. Cir. 2006) (Hispanic farmers); *Love v. Johanns*, 439 F.3d 723 (D.C. Cir. 2006) (female farmers). Instead, USDA voluntarily created a joint claims process for both Hispanic and female farmers. See *Garcia/Love* Framework. Claimants who wished to recover under the *Garcia /Love* Framework agreed, in the claim packets they submitted, to release their individual claims against USDA. See id. ¶ 5; Settlement Agreement, *Love*, No. 1:00-cv-02502 (D.D.C. Feb. 3, 2017), ECF No. 2751.

7.      Despite the various efforts outlined above discrimination problems have continued to plague USDA's lending programs.

8.      As a result, Congress enacted a race-based discrimination loan-forgiveness program in the American Rescue Plan of 2021 (ARPA). Among other things, ARPA provided debt relief to "socially disadvantaged" farmers and ranchers. The phrase "socially disadvantaged" included racial classifications. To be eligible for ARPA's debt relief, farmers and ranchers had to be Black or African American, American Indian or Alaskan native, Hispanic of Latino, or Asian American or Pacific Islander. This program was codified in §1006 of ARPA.

9.      The race-based criterion for relief under §1006 of the ARPA, was challenged in multiple cases that alleged that these racial classifications violated the Equal Protection Clause of the United States Constitution. The program was therefore suspended.

10.     In response to Equal Protection challenges §1006 of the ARPA was amended by §22007 of IRA.

11. Section 22007 states:

Section 1006 of the American Rescue Plan Act of 2021 (7 U.S.C. 2279 note; Public Law 117-2) is amended to read as follows:

(e) DISCRIMINATION FINANCIAL ASSISTANCE.—In addition to amounts otherwise available, there is appropriated to the Secretary of Agriculture for fiscal year 2022, <u>to remain available until September 30, 2031</u>, out of any money in the Treasury not otherwise appropriated, $2,200,000,000 for a program to provide financial assistance, including the cost of any financial assistance, to farmers, ranchers, or forest landowners determined to have experienced discrimination prior to January 1, 2021, in Department of Agriculture farm lending programs, under which the amount of financial assistance provided to a recipient may be not more than $500,000, as determined to be appropriate based on any consequences experienced from the discrimination, which program shall be administered through 1 or more qualified nongovernmental entities selected by the Secretary subject to standards set and enforced by the Secretary. (Emphasis added.)

12.     On July 7, 2023 USDA published application guidelines to implement §22007.

13.     Among these guidelines is a no exceptions January 13, 2024 application deadline.

14.     Also among the DFAP guidelines are eligibility requirements that contradict the terms of Section 22007 of the IRA which amended Section 1006 of the ARPA.

15.     In March 2021, Congress passed the American Rescue Plan Act ("ARPA"), Pub. L. No. 117-2, 135 Stat. 4 (2021), which provided economic aid and support to the agricultural sector. See §§ 1001-1007. Section 1005 of ARPA provided for payments of up to 120 percent of certain USDA farm loan debts held by "socially disadvantaged farmer[s] or rancher[s]," a group defined to include those who "have been subjected to racial or ethnic prejudice because of their identity as members of a group without regard to their individual qualities." § 1005; 7 U.S.C. § 2279(a)(5)-(6). In addition, Section 1006 provided for "financial assistance to socially disadvantaged farmers, ranchers, or forest landowners that are former farm loan borrowers that suffered related adverse actions or past discrimination or bias in Department of Agriculture programs, as determined by the Secretary." § 1006. Pub. L. 117-169, 136 Stat. 1818 §§ 22007-08.

16.    Among loan programs historically administered by USDA are those administered pursuant to 42 U.S.C. §1471, et seq. which empowers the Secretary of Agriculture to provide financing to low and very low income applicants.

17.    In point of fact, 42 U.S.C. §1472, provides in pertinent part "Loans for housing and buildings on adequate farms."

"(d) Dwelling units available to very low-income families or persons."

On and after November 30, 1983

(1) not less than 40 percent of the funds approved in appropriation Acts for use under this section shall be set aside and made available only for very low-income families or persons; and

(2) not less than 30 percent of the funds allocated to each State under this section shall be available only for very low-income families or persons.

18.    The lending authority described above emanates from 42 U.S.C. §1471, which states:

42 U.S. Code §1471 – Financial assistance by Secretary of Agriculture

(a) AUTHORIZATION AND PURPOSES OF ASSISTANCE

The Secretary of Agriculture (hereinafter referred to as the "Secretary") is authorized, subject to the terms and conditions of this subchapter, to extend financial assistance, through the Farmers Home Administration, (1) to owners of farms in the United States and in the Territories of Alaska and Hawaii and in the Commonwealth of Puerto Rico, the Virgin Islands, the territories and possessions of the United States, and the Trust Territory of the Pacific Islands, to enable them to construct, improve, alter, repair, or replace dwellings and other farm buildings on their farms, and to purchase buildings and land constituting a minimum adequate site, in order to provide them, their tenants, lessees, sharecroppers, and laborers with decent, safe, and sanitary living conditions and adequate farm buildings as specified in this subchapter, and (2) to owners of other real estate in rural areas for the construction, improvement, alteration, or repair of dwellings, related facilities, and farm buildings and to rural residents, including persons who reside in reservations or villages of Indian tribes, for such purposes and for the purchase of buildings and the purchase of land constituting a minimum adequate site, in order to enable them to provide dwellings and related facilities for their own use and buildings adequate for their farming operations, and (3) to elderly or handicapped persons or families who are or will be the owners of land in rural areas for the construction, improvement, alteration, or repair of

8

dwellings and related facilities, the purchase of dwellings and related facilities and the purchase of land constituting a minimum adequate site, in order to provide them with adequate dwellings and related facilities for their own use, and (4) to an owner described in clause (1), (2), or (3) for refinancing indebtedness which…

19.     The Farm Service Agency (FSA) was created in 1994 as a successor to the  Farmers Home Administration ("FmHA"). See Pub. L. No. 103-354, 108 Stat. 3209 (Oct. 13, 1994); *Pigford v. Glickman,* 182 F.R.D. 341, 343 (D.D.C. 1998). There are two main divisions of FSA: the Program Division and the Farm Loan Division.  The Program Division deals with non-loan programs that help farmers manage market risk, recover from disasters, and conserve and protect natural resources, such as commodity programs, price support programs, and other types of government payments. The Farm Loan Division provides various kinds of loans to farmers, including farm ownership loans and operating loans.

20.     Farm ownership loans are loans made for the purchase or improvement of real estate. 7 C.F.R. § 1943.16 (2002). Operating loans are loans made for the purchase of machinery and equipment, livestock, facilities, and annual operating expenses, such as fuel, fertilizer, seed, and feed; 7 C.F.R. § 1941.16. Farm ownership and farm operating loans can be "direct loans," whereby FSA makes a loan directly to a borrower and also services the loan. They may also be "guaranteed loans," whereby FSA guarantees a loan made by another lender. 7 C.F.R. § 762.101. FSA also can make direct emergency loans that may be used for various purposes. See 7 C.F.R. §§ 1945.151, 1945.166.

21.     The Rural Housing Service ("RHS") of the United States Department of Agriculture, through its predecessor the Farmers Home Administration ("FmHA"), is authorized to make low-interest mortgage loans to private nonprofit entities to provide rental housing for low-income tenants, pursuant to § 515 of the Housing Act of 1949 (codified at 42 U.S.C. § 1485). The

mortgage loan agreements contain restrictions on, inter alia, eligible renters and rents that can be charged.

      22.    The operation of RHS is governed by 7 CFR Part 3550, which provides in pertinent part:

PART 3550-DIRECT SINGLE FAMILY HOUSING LOANS AND GRANTS

Authority: 5 U.S.C. 301; 42 U.S.C. 1480.

Source: 61 FR 59779, Nov. 22, 1996, unless otherwise noted.

Subpart A—General

§ 3550.1 Applicability.

This part sets forth policies for the direct single family housing loan programs operated by the Rural Housing Service (RHS) of the U.S. Department of Agriculture (USDA). It addresses the requirements of sections 502 and 504 of the Housing Act of 1949, as amended, and includes policies regarding both loan and grant origination and servicing. Procedures for implementing these regulations can be found in program handbooks, available in any Rural Development office. Any provision on the expenditure of funds under this part is contingent upon the availability of funds.

§ 3550.2 Purpose.

The purpose of the direct RHS single family housing loan programs is to provide low- and very low-income people who will live in rural areas with an opportunity to own adequate but modest, decent, safe, and sanitary dwellings and related facilities. The section 502 program offers persons who do not currently own adequate housing, and who cannot obtain other credit, the opportunity to acquire, build, rehabilitate, improve, or relocate dwellings in rural areas. The section 504 program offers loans to very low-income homeowners who cannot obtain other credit to repair or rehabilitate their properties. The section 504 program also offers grants to homeowners age 62 or older who cannot obtain a loan to correct health and safety hazards or to make the unit accessible to household members with disabilities.

§ 35503 Civil rights.

RHS will administer its programs fairly, and in accordance with both the letter and the spirit of all equal opportunity and fair housing legislation and applicable executive orders. Loans, grants, services, and benefits provided under this part shall not be denied to any person based on race, color, national origin, sex, religion, marital status, familial status, age, physical or mental disability, receipt of income from public assistance, or because the applicant has, in good faith, exercised any right under the Consumer Credit Protection Act

(15 U.S.C. 1601 et seq.). All activities under this part shall be accomplished in accordance with the Fair Housing Act (42 U.S.C. 3601-3620), Executive Order 11246, and Executive Order 11063, as amended by Executive Order 12259, as applicable. The civil rights compliance requirements for RHS are in 7 CFR part 1901, subpart E.

23.    Section 502 direct loans are among USDA farm lending programs. Within the membership of BFAA are substantial number of RHS loan applicants, including Plaintiff Furlow, and recipients who were prior to January1, 2021 discriminated against by USDA.

24.    Among BFAA members are a substantial number of applicants, including Plaintiffs Ferguson and Jackson and recipients for loans administered by FSA who have claims on behalf of decedents.

25.    Farm lending programs referenced within Section 22007 and in past instances of Congressional action to address USDA lending discrimination, included both RHS and FSA loans as both categories are within the ambit of  former  FHA lending programs.

26.    The USDA DFAP guidelines which require applications to be submitted by January 13, 2024 and excludes legacy and RHS loans are arbitrary and capricious.

27.    For reasons explained below given the history, timing and process involved for Plaintiffs to submit an application for relief under §22007, the January 13, 2024 deadline, limitation to FSA loans and exclusion of legacy claims is arbitrary, capricious, not rationally related to any legitimate governmental goal, violative of separation of powers and Due Process and was not authorized by Congress. For these reasons, Plaintiffs respectfully request that this Honorable Court enjoin all three guidelines.

### III.    JURISDICTION AND VENUE

28.    This Court has jurisdiction over this complaint under 28 U.S.C. §1331, §2201, and 5 U.S.C. §702-706, because this case presents substantial questions of Constitutional and federal law, specifically whether Section 22007 of IRA and Defendants' implementation of that section is

arbitrary and capricious, violative of Separation of Power and Due Process and authorized by Congress.

29.     This Court has authority to issue a declaratory judgment and to order injunctive relief and other relief that is necessary and proper pursuant to 28 U.S.C. § 2201 and 2202.

30.     Venue is appropriate in this district under 28 U.S.C. § 1391(e)(1). A substantial part of the events giving rise to this claim occurred in this district, Defendants maintain one or more offices and employees in this district, a substantial part of the property subject to this action is situated in this district, and a plaintiff resides in this district.

## IV.     PARTIES

31.     Plaintiff, Black Farmers & Agriculturalists Association, Inc. (BMA) is a not-for-profit organization created for the specific purpose of responding to the issues and concerns of Black ranchers in the United States and abroad. Formed in 1997, the organization has a membership of more than one thousand live hundred (1,500) farmers nationwide, and 21 state chapters. BFAA was also organized to monitor the conduct of the U.S. Department of Agriculture and the historic 1999 class action lawsuit, *Pigford v. Glickman*, 185 F.R.D. 82 (D.D.C. 1999) (hereinafter "*Pigford*").[1]

---

[1] The historical context that gives rise to this litigation and the need for BMA was summarized by the district court in its order approving settlement as follows:

> Forty acres and a mule. That was the promise made by the government to those former slaves who wanted to farm land in the South after the Civil War. As detailed in this Court's opinion in *Pigford I*, for most African-Americans the promise of forty acres and a mule was never kept, and the United States Department of Agriculture and the county commissioners to whom it delegated so much power bear much of the responsibility for the broken promise to those African-American farmers and their descendants. *Pigford v. Glickman*, 185 F.R.D. at 85. In the early 1900's, there were 925,000 African-American farmers in the United States farming 16 million acres of farmland. By the time the Court approved the *Pigford I* consent decree, there were fewer than 18,000 African-American farms in the United States and African-American farmers owned less than three million acres of land. Id. As the Court said 12 years ago in approving the consent decree," [n]othing can completely undo the discrimination of the past or restore lost land or lost opportunities" to the many African-American farmers who were part of the *Pigford I* class. Id. at 112. Historical discrimination cannot be undone, but the *Pigford I* consent decree was a significant first step, a step that had been a long time coming. And, as described earlier in this Opinion, supra at 9, nearly 16,000 African-

12

32.     Thomas Burrell, is a farmer and President of BFAA. Mr. Burrell is representative of other BFAA members who have claims that meet Section 22007's eligibility criteria.  BFAA has among its membership individuals with qualifying claims that must be asserted on behalf of a decedents' estates. For instance BFAA has persistently pursued relief from USDA racial discrimination on behalf of the Estate of David Shelton, the Estate of Lee Sylvester Caldwell and the Estate of Earnest Lee Bayland in United States District Court, Case No. 15-cv-1112 (TSC). These claims, and others like them referred to herein as "Legacy Claims" until now have been deemed time-barred. BFAA members legacy claims may qualify for §22007 assistance.

33.     Defendant Thomas J. Vilsack is the Secretary of Agriculture. He is responsible for leading the USDA, which includes the FSA. Under Section 22007 of IRA. Defendant Vilsack is required to provide debt relief to farmers who have experienced discrimination prior to 2021.

34.     Defendant Zack Ducheneaux was appointed Administrator for USDA's Farm Service Agency on February 22, 2021. In this role Ducheneaux provides leadership and direction on agricultural policy, administering loan programs, and managing conservation, commodity, disaster, and farm marketing. Programs through a national network of offices including offices in the Western District of Tennessee.

## V.      FACTS COMMON TO ALL COUNTS

35.     On July 7, 2023, USDA announced DFAP, USDA issued a forty page DFAP application that must be submitted by January 13, 2024.  IRA Section §22007, which authorized

---

American farmers received a total of more than $1 billion through the claims process created by the settlement of that historic case."

Docket No. 232, p. 69.
        BFAA's purpose is to assist Black farmers, many of whom are sharecroppers or descendants of sharecroppers, in connection with their understanding of and participation in this settlement process as well as to seek prospective relief on their behalf.

DFAP financial assistance, states assistance funds are available through September 30, 2031.
Section 22007 does not authorize the brief application window promulgated by Defendants, nor
does it authorize excluding Legacy or housing loan application.

## VI.  CLASS ALLEGATIONS

36.     Plaintiffs bring this action under Rule 23 of the Federal Rules of Civil Procedure
on behalf of Plaintiffs the  ("Class") .  The Class Period commenced on July 15, 1949 ,the
enactment date of FHA

37.     Plaintiffs bring this action under Federal Rule of Civil Procedure 23(b)(1) on behalf
of a class defined as:

> All persons who experienced discrimination  in a United States Department of Agricultural
> lending program prior to January 1, 2021.

38.     Plaintiffs also bring this action under Federal Rule of Civil Procedure 23(b)(2) on
behalf of a class defined as set for the in Paragraph 37 for the reason adjudication of the issues
raised here will be dispositive of the claims of all persons affected.

39.     Plaintiffs also bring this action under Federal Rule of Civil Procedure 23(b)(3) on
behalf of a class defined as set forth in Paragraph 37  for the reason questions of law common to
the class predominate over the claims of individual class members.

40.     The claims of Plaintiff are typical of the claims of the Class.  Plaintiffs will fairly
and adequately protect the interests of the Class.  Plaintiffs have no conflicts with any other Class
Member, and has retained competent counsel experienced in class action litigation.

41.     Common questions of law and fact exist.  Questions of law and fact are common to
the Class and predominate over any questions affecting only individual Class Members.

42.     Class action treatment is a superior method for the fair efficient adjudication of the controversy described herein.  A class action provides an efficient method whereby enforcement of the rights of Plaintiffs and USDA can be fairly managed.

## THE RULEMAKING

43.     According to USDA, following signing of the IRA, USDA undertook steps to convene listening sessions and seek public comment about the design of the program to ensure that farmers, advocates, academics, legislators. tribal governments, and other experts were heard. USDA has committed to making payments to farmers no later than early 2024.

44.     With this public feedback taken into account, in March 2023. USDA announced the basic structure of the prop am. The IRA specifies that financial assistance must be delivered to impacted producers by nongovernmental program administrators.

45.     In early May, USDA signed contracts with three vendors who, together, constitute a national administrator and four regional hubs. The vendors are working together to solicit applications from eligible farmers, provide technical assistance, and make decisions about each case (following rides set by USDA).

46.     The vendors include Midtown Group, serving as the national administrator; Windsor Group, serving producers in the eastern regions of the U.S. and Analytic Acquisitions, serving the western regions. The national administrator will manage all aspects of the application process including making determinations on applications. while the regional hubs will conduct outreach and technical assistance in addition to providing recommendations on applications. Plaintiffs are within the jurisdiction of the Windsor Group.

47.    Applications are due January 13, 2024 –USDA has stated, unlike in past instances such as *Pigford* there will be no extensions. The specific deadline depends on the application submission method:

- U.S. or overnight mail must be postmarked by January 13, 2024

- Efiling; by 11:59 p.m. Pacific Time, January 13, 2024

- In person, at a regional office: by 8 p.m. local time on January 13, 2024.

48.    The January 13, 2024 deadline does not advance any compelling governmental interest. It is arbitrary and capricious. The deadline is unreasonable given the complexity of the application.

49.    The deadline under Section 22007 of IRA does not advance a compelling governmental interest, invades the exclusive province of Congress and deprives Plaintiffs of Due Process. Accordingly, it may be challenged under the Administrative Procedures Act.

## VII.    LEGAL FRAMEWORK

## ADMINISTRATIVE PROCEDURE ACT

50.    Agency actions are reviewed deferentially.  Courts may not set aside or hold unlawful an agency action unless that action is <u>arbitrary</u>, <u>capricious</u>, an abuse of discretion or otherwise not in accordance with law. *Bangura v. Hansen*, 434 F. 3d 487, 502 (6th Cir. 2006) (citing 5 U.S.C. § 706(2)(A)). "An agency decision is <u>arbitrary and capricious</u> if the agency fails to examine relevant evidence or articulate a satisfactory explanation for the decision." <u>Id</u> The Court can not supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Assn v. State Farm Mut. Auto Ins. Co*., 463 U.S. 29, 43 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983).

51.    The Administrative Procedure Act ("APA") waives the sovereign immunity of the United States and its federal agencies for challenges to final agency action that seek relief other than monetary damages. In enables parties who are adversely affected or aggrieved by agency action to seek judicial review thereof. 5 U.S.C. §§702, 704.

52.    The APA also specifically authorizes courts to postpose the effective date of an agency action when warranted. 5 U.S.C. §705 ("[T]o the extent necessary to prevent irreparable injury, the reviewing court…may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.")

53.    Plaintiffs in this action have been adversely affected by USDA's arbitrary and capricious establishment of a no exceptions rigid application filing date of October 31, 2023.

54.    The January 13, 2024 deadline is a final agency action. Immediate judicial review is respectfully requested as Plaintiffs have no other adequate remedy in Court.

55.    The January 13, 2024 deadline is limitation to FSA loans and restrictions against legacy claims the consummation of USDA's implementation of Section 22007.

56.    A non appealable permanent bar to DFAP relief, will flow from failure to meet the challenged guidelines.

57.    Plaintiffs are aggrieved by the arbitrary guideline and hereby respectfully seek an order suspending the deadline.

## CLAIMS FOR RELIEF

## COUNT 1 (SEPARATION OF POWERS)

58.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

59.     Section 22007 centralizes vast power in the hands of USDA, without the ordinary protections of due process, to decide the fate of farmers who have been victimized by discrimination.

60.     No principle is more central to the design of the Constitution than the separation of powers. See, *Dayton Area Chamber of Commerce, et al. v. Xavier Becerra*, S.D. Ohio Case No. 3:23-cv-00156.

61.     Article I of the Constitution vests legislative Powers" in the "Congress of the United States." U.S. Const. art. 1, § 1 . Article II vests the executive power -the power to implement the laws in the President. Article III vests the judicial power the power to interpret the laws in the courts.[2]

62.     To protect that fundamental separation of powers, the Supreme Court has long distinguished between certain "important subjects, which must be entirely regulated by the legislature itself" and "those of less interest," as to which Congress may afford the executive branch discretion "to fill up the details." Wayman v Southard, 23 U.S. (10 Wheat.) 1, 42-43 (1825). Id.

63.     The Supreme Court has accordingly invalidated statutes that confer "virtually unfettered" discretion on the executive branch to control broad swaths of the private economy. *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495,542 (1935) (invalidating delegation to create code of industrial conduct that fosters "fair competition"); see also *Panama Relining Co. Ryan*, 293 U.S. 388 (1935) (invalidating delegation to ban petroleum shipments in excess of state production quotas).

64.     In Schechter Poultry, the Court emphasized the lack of "judicial review to give assurance that the action of the commission is taken within its statutory authority" and the absence

---

[2] Any power exercised by USDA must come from the President or be specifically authorized by Congress.

of "appropriate administrative procedure" to ensure due process. 295 U.S. at 533, 541 . *In Panama Refinin*g, the Court highlighted the failure to constrain the executive branch with any "standard or rule" of decision. 293 U.S. at 418. Id.

65.     Under the Supreme Court's modern precedents, a statutory delegation is invalid if it fails to constrain the agency with an "'intelligible principle.'" *Gundy v. United States*, 139 S. Ct. 21 16, 2129 (2019) (plurality op.) (*quoting J.W. Hampton, Jr, & Co. v. United States*, 276 U.S. 394, 409 (1928)). This "intelligible principle" must at least be "sufficiently definite and precise to enable Congress, the courts and the public to ascertain whether the [agency] . . . has conformed" to Congress's direction. *Yakus v. United States*, 321 U.S. 414, 426 (1944).

66.     Courts have also consistently recognized that "judicial review is a factor weighing in favor of upholding a statute against a nondelegation challenge." *United Stales v. Garfinkel*, 29 F.3d 451, 458-59 (8th Cir. 1994) (quoting *United States v. Bozarov*, 974 F.2d 1037, 1042 (9th Cir. 1992)) (collecting cases). Similarly, "compliance with . . . requirements for notice and comment" enhances public accountability and thereby functions as a check on agency discretion. *Id.; cf: Panama Ref Co.*, 293 U.S. at 415 (noting the importance of written findings).

67.     A lack of due process protections exacerbates the separation-of-powers concerns raised by a broad administrative delegation.

68.     There is no justification for USDA being permitted to arrogate unto itself the powers to set a January 13, 2024 deadline or limit relief to living FSA applicants. Congress has given USDA until September 30, 2031 to expend the funds appropriated for financial assistance.

69.     The guidelines violates separation of powers because it gives USDA total authority to set arbitrary USDA's actions.

70.     Plaintiffs have been aggrieved by this and requests its suspension.

19

## COUNT 2 (DUE PROCESS)

71.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

72.    The United States Supreme Court has stated:

The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be "condemned to suffer grievous loss," *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U. S. 123, 341 U. S. 168 (1951) (Frankfurter, J., concurring), and depends upon whether the recipient's interest in avoiding that loss outweighs the governmental interest in summary adjudication. Accordingly, as we said in *Cafeteria & Restaurant Workers Union v. McElroy*, 367 U. S. 886, 367 U. S. 895 (1961), "consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved, as well as…

See, *Goldberg v. Kelly,* 397 U.S. 254 (1970).

73.    The Fifth Amendment's Due Process Clause prohibits the government from depriving a person of property without adhering to constitutionally sufficient procedures. See, *Ky. Dept. of Corr. V. Thompson*, 490 U.S. 454, 460 (1989), notice and an opportunity to be heard.

74.    The Due Process Clause requires notice and an opportunity to be heard "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965); see also, *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). Due process requires procedural protections to prevent, to the extent possible, an erroneous deprivation of property. See, *Gilbert v. Homar*, 520 U.S. 924, 930-32 (1997).

75.    Section 22007, as implemented by USDA, gives affected farmers no opportunity to challenge the deadline or restriction to living FSA applicants.

76.    BFAA  member legacy claims requires BFAA members to complete within the application window a complex forty page application. In cases where the aggrieved farmer has died, USDA has stated heirs of these applicants must have written authority to pursue the

decedent's claims. BFAA members also desire relief for non FSA loans. There is no authority in

§22007 for such draconian administrative guidelines.

77.    The DFAP guidelines are unconstitutional under the Fifth Amendment and must be

enjoined.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Declare that the January 13, 2024 application deadline violative of separation of

powers;

B.    Declare that the January 13, 2024 application deadline violative of Due Process

Clause of the Fifth Amendment;

C.    Immediately suspend the January 13, 2024 deadline pending resolution of

Plaintiffs' declaratory judgment action;

D.    Declare the DFAP program open to RHS and FSA applicants and to decedent's

estates;

E.    Award Plaintiffs reasonable attorneys' fees and costs, plus interest and accruing

thereon;

F.    Appoint Plaintiffs as class representatives;

G.    Appoint Plaintiffs' Counsel as Counsel for the Class; and

H.    Grant such other and further relief as the Court may deem appropriate.

*s/Percy Squire*
Percy Squire, Esq. (0022010)
341 S. Third Street, Suite 10
Columbus, Ohio 43215
psquire@sp-lawfirm.com
Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served via the Court's

electronic mail filing October 10, 2023, counsel of record.

*s/Percy Squire, Esq.*
Percy Squire, Esq. (0022010)